# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

_____

| | | |
|---|---|---|
| POWER PROBE GROUP, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. |
| | ) | |
| KMC ELECTRONICS LLC | ) | **Jury Trial Demanded** |
| | ) | |
| Defendant. | ) | **Bond Sought** |
| | ) | |

_____

## DECLARATORY JUDGMENT COMPLAINT

Plaintiff Power Probe Group, Inc. (hereinafter "Power Probe" or "Plaintiff"), in support of this Declaratory Judgment Complaint against KMC Electronics LLC (hereinafter "KMC Electronics" or "Defendant") does hereby allege as follows:

### NATURE OF THE ACTION

1.　　This case involves unlawful attempts by Defendant to extract and extort a baseless and unreasonable license from Power Probe for alleged patent infringement of U.S. Patent No. 9,494,634 (the "'634 Patent," "Accused Patent" or the "Asserted Patent").

2.　　Beginning on March 6, 2025, and over the course of several exchanges of documents, email correspondence, and telephonic conferences thereafter, Defendant has repeated its accusation that Power Probe's DM300AUTO Digital Multimeter and Power Probe's Fuse Monitor (collectively the "Accused Products") infringe the Asserted Patent, and has demanded that Power Probe must take a license. As explained in greater detail below, Power Probe does not infringe any valid claim of the Asserted Patent. Moreover, Defendant's allegations of infringement

were made in bad faith and are objectively baseless, in violation of the North Carolina Abusive Patent Assertion Act (N.C. Gen. Stat. §§ 75-140, et. seq.) (hereinafter the "APAA").

3.      Additionally, as explained in greater detail below, the Asserted Patent is invalid for failure to satisfy one or more of the conditions for patentability set forth in 35 U.S.C. § 101 *et seq*., including particularly, 35 U.S.C. §§ 102, 103, 112, and/or 119.

4.      Accordingly, Power Probe brings this action seeking: (1) a declaration under the Declaratory Judgment Act (28 U.S.C. § 2201) that the Asserted Patent is invalid and unenforceable; (2) a declaration under the Declaratory Judgment Act (28 U.S.C. § 2201) that Power Probe has not and does not infringe any valid and enforceable claim of the Asserted Patent; and (3) the entry of appropriate injunctive relief and the recovery of damages (including costs of suit and attorneys' fees) resulting from Defendant's unlawful and abusive conduct in violation of the APAA and other applicable law.

## THE PARTIES

5.      Plaintiff, Power Probe Group, Inc. ("Plaintiff" or "Power Probe") is a Delaware corporation with its address at 6509 Northpark Boulevard, Unit 400, Charlotte, North Carolina 28216.

6.      Power Probe is dedicated to the creation of innovative, easy to use diagnostic equipment for the automotive industry. Power Probe strives to meet the increasingly complex needs of today's automotive technician.

7.      Power Probe is a leader in providing electrical circuit testers to the automotive industry. Power Probe's products provide users with a multitude of testers at their fingertips.

8.      Power Probe's products are designed in the United States and have been manufactured in the United States as well as in other countries.

2

9. On information and belief, Defendant KMC Electronics LLC is a North Carolina limited liability company with an address at 704 Maple Street, Locust, North Carolina 28097-9448.

10. On information and belief, and according to the North Carolina Secretary of State's website, Kevin M. Curtis is the registered agent and a managing member of Defendant, and is affiliated with the following address: 704 Maple Street, Locust, North Carolina 28097-9448.

11. On information and belief, Defendant is a non-practicing entity.

12. Non-practicing entities are colloquially referred to as "patent trolls."

13. On information and belief, Defendant does not practice the Asserted Patent. Instead, Defendant's business model is predominantly directed to monetizing its patents, including the Asserted Patent, via licensing.

14. Indeed, Defendant's managing member and the Accused Patent's named inventor—Mr. Kevin M. Curtis—has made a living as a patent troll, including speaking on topics relating to filing patent applications for the sole purpose of obtaining patent royalties.

## JURISDICTION AND VENUE

15. The Court has original and exclusive subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1338 (a) and (b) because this Complaint states claims arising under Acts of Congress, including the Patent Act, *i.e.*, 35 U.S.C. § 101 *et. seq.*

16. The Court also has original and exclusive subject matter jurisdiction over these claims because this Complaint arises under the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201 and 2202), in that it involves an actual case or controversy due to Defendant's accusation that Power Probe infringes the Asserted Patent and its repeated licensing demands made to Power Probe.

3

17.     The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all other claims asserted or that may be asserted that are so related to claims within the original jurisdiction of this action that they form part of the same case or controversy under Article III of the United States Constitution, including over Power Probe's claim under the APAA (N.C. Gen. Stat. §§ 75-140 *et seq.*) because, as set forth below, the APAA claim is related to the claim(s) over which the Court has original jurisdiction.

18.     Pursuant to 28 U.S.C. §§ 1391(b), 1391(c), 1391(d), and 1400(b), venue is proper in the Western District of North Carolina (hereinafter "this District"), since Power Probe's principal place of business is in this District, and since a substantial part of the events giving rise to the claims in this Complaint occurred in this District. For example, by attempting to exact a patent license from Power Probe, Defendant has directed its licensing efforts into this District. In other words, a substantial part of the events giving rise to Power Probe's claims occurred in this District.

19.     On information and belief, Defendant conducts all of its patent licensing activities from its location in North Carolina, sufficient to warrant general jurisdiction over Defendant in North Carolina.

20.     This Court has *in personam* jurisdiction over Defendant because Defendant has knowingly and repeatedly directed its licensing activities into this District, not least as evidenced by its unlawful attempt to exact a license from Power Probe. For example, Mr. Curtis signed the March 6, 2025 Letter on behalf of Defendant and addressed and delivered it into North Carolina, specifically to Power Probe at its Charlotte, NC location.  By seeking out and threatening litigation against Power Probe, an entity known to operate in North Carolina, and in this District, Defendant should reasonably be expected to be subject to *in personam* jurisdiction in this District.

4

21.     Each of Defendant's communications with Plaintiff, including but not limited to the March 6, 2025 Letter which was addressed to (and delivered into) a North Carolina entity at a North Carolina address, constitutes a separate act sufficient to warrant *in personam* jurisdiction over Defendant.

22.     Additionally, pursuant to § 75-145(e) of the Abusive Patent Assertion Act, "any person who has delivered or sent, or caused another to deliver or send, a demand to a target in North Carolina has purposefully availed himself or herself of the privileges of conducting business in this State and shall be subject to suit in this State, whether or not the person is transacting or has transacted any other business in this State.

23.     Defendant has "delivered or sent, or caused another to deliver or send" a demand letter to Plaintiff, sufficient to invoke § 75-145(e).

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### *The Asserted Patent*

24.     The '634 Patent issued on November 15, 2016 from non-provisional application, Application No. 14/271,542 (hereinafter the "'542 Non-Provisional Application"). A copy of the '634 Patent is attached hereto as **Exhibit A**. A copy of the '542 Non-Provisional Application is attached hereto as **Exhibit B**.

25.     Notably, the '634 Patent claims priority to an early *provisional* application, Application No. 61/855,654 (the "'654 Provisional Application"), which was filed on May 20, 2013.  A copy of the '654 Provisional Application is attached hereto as **Exhibit C**.

26.     The '634 Patent is titled *Current Tester* and allegedly invented a current tester comprising, *inter alia*, a probe, a computing device for converting a voltage drop across a component to a current, and an output device for signaling a presence or non-presence of current,

5

wherein the computing device stores a pre-determined voltage drop/current relationship for the component.

27. The patented invention of the '634 Patent is described in its specification as follows:

As known by those skilled in the art, voltage drop is measured, with a volt meter, in parallel with a component, while current passing through that component is measured, with an amp meter, in series with the component.

Current leaks, sometimes called "parasitic leaks," are bad for circuits. Those leaks can cause an unnecessary drain on the power source for the circuit. Moreover, finding those leaks can be difficult, particularly if the space around the circuit is limited, making the use of the amp meter difficult.

For example, a parasitic leak in an automotive circuit can result in a dead battery. To locate the leak, typically, requires that the technician remove a fuse, connect the amp meter to the circuit, energize the circuit, and then test the circuit to determine the presence or non-presence of current. This process is time consuming. Moreover, the space around the automotive fuse panel is limited, so it can be difficult to get the amp meter in position to perform the test.

Accordingly, there is a need for a more convenient device and method for testing current flowing through a circuit.

28. According to the '634 Patent itself, a key aspect of the patented invention is that the "computer device stores a pre-determined voltage drop / current relationship for the component."

29. The '634 Patent illustrates the "voltage drop / current relationship" in Figures 3 and 4 (reproduced below):

6



Fig. 3

Fig. 4

30. The '634 Patent goes on to describe the benefits of storing a pre-determined voltage

drop / current relationship:

> Each of these fuses is a precision component that has a very defined and reproducible resistance over a given current range. That resistance is useful in determining the voltage drop/current relationship for the component (or fuse). For example, one may determine the voltage drop/current relationship by inputting a known current through the component and measuring the voltage drop corresponding to that current. If many of these points are determined over a range of currents, then a line may be drawn to show the relationship of current to voltage drop for a given component over the range of currents. That line may then be translated to a mathematical equation (for example, by regression analysis) or defined in a look-up table.
>
> In one embodiment, the voltage drop/current relationship for a 5 amp mini fuse is shown in FIGS. 3 and 4. FIG. 3 shows the relationship over the range of 0.0-0.12 amps (increments of 0.01 amps). FIG. 4 shows the relationship over the range of 0.0-5.0 amps (increments of 0.1 amps). In both figures, the Y-axis is the amperage,

7

while the X-axis represents the voltage drop (after amplification and converting to a digital value). The amperage ranges overlap and the choice of which relationship is used may be based upon limits of the sample taken at the time of sampling.

Microprocessor 36 may include the following operations: 1) **storing the pre-determined voltage drop/current relationships**, 2) selecting the proper relationship based on input from the input device 20, 3) determining the current based upon the signal (e.g., voltage drop across the component) from the probes using the properly selected relationship, 4) outputting the message via the output device 18, and 5) sensing a ground produced by the computing device on one lead of the probe to a ground at the other lead of the probe to determine whether the probe is properly connected to the component.

**Exhibit A**, 2:51-3:6, 4:4-17 (emphasis added).

31.     Specifically, as it relates to the '634 Patent, "the computing device [] translates the measured voltage drop to a current **using the stored pre-determined voltage drop/current relationship** and outputs the calculated current to a visual display."

32.     This key aspect of the patented invention shows up in Claim 1 of the '634 Patent:

1. A current tester for parasitic current leaks comprising:

a probe,

a computing device for converting a voltage drop across a fuse to a current, the voltage drop is associated with the parasitic current leak, said computing device operatively associated with said probe,

an input device for selecting among multiple fuses types, said input device operatively associated with said computing device, **each fuse type having a pre-determined voltage drop/current relationship stored in said computing device**, and

an output device for signaling a presence or non-presence of the parasitic current leak, said output device operatively associated with said computing device.

33.     As will be explained in greater detail below, this key aspect of the '634 Patent (relating to storing a pre-determined voltage drop/current relationship for different fuse types) is not present in the '654 Provisional Application to which the '634 Patent claims priority.

34. This absence has a profound impact on the true priority date of the '634 Patent, *i.e.*, whether the '634 Patent is entitled to priority as of May 20, 2013 (the filing date of the '654 *Provisional* Application), or whether, instead, it is only entitled to priority as of May 7, 2014 (the filing date of the '542 *Non-Provisional* Application), as well as the applicant's candor to the Patent Examiner.

35. The actual priority date of the '634 Patent—which Power Probe submits is May 7, 2014—renders the '634 Patent invalid and unenforceable, since, as explained in greater detail below, a product embodying the alleged invention of the '634 Patent was on sale in 2012. As will be explained in greater detail below, this runs afoul of the "on sale bar" as codified in 35 U.S.C. §102(a)(1). Indeed, even assuming *arguendo* that the '634 Patent were entitled to the earlier (May 20, 2013) priority date—which is not—it would still be invalid for that reason, *i.e.*, "the claimed invention was … on sale… before the effective filing date of the claimed invention."

### *Relevant Prosecution History of the Asserted Patent*

36. The '654 Provisional Application was filed on May 20, 2013. *See* **Exhibit C**. In its entirety, the '654 Provisional Application comprises a mere 13 pages, only 5 of which contain a description of the alleged invention, including a mere 4 figures.

37. Notably, though the description in the '654 Provisional Application repeatedly refers to "caculat[ing] the amount of current that is flowing," including that "the function of calculating the current level based upon a fuse rating and voltage drop could be performed by a computer," the '654 Provisional Application never discloses or even discusses the notion of **storing** a pre-determined voltage drop/current relationship.

38. Indeed, the notion of a "pre-determined voltage drop/current relationship" did not appear until the '542 Non-Provisional was filed on May 7, 2014.

39.     Additionally, even the original as-filed claims of the '542 Non-Provisional Application (see below) made no reference to the pre-determined voltage drop/current relationship being associated with a fuse of known resistance:

I claim:

    1.    A current tester comprising:

        a probe,

        a computing device for converting a voltage drop across a component to a current, said computing device operatively associated with said probe, said computing device having a pre-determined voltage drop/current relationship for said component stored in said computing device, and

**Exhibit B**, pg. 22 of 199.

40.     Rather, it was not until January 8, 2016, in response to an October 22, 2015 Office Action rejection, that the applicant made the following claim amendment, and, for the first time, added the phrase: "each fuse having a pre-determined voltage drop/current relationship stored in said computing device…" (see below)

10

**Amendments to the Claims**

    1.      (currently amended)  A current tester comprising:

          a probe,

          a computing device for converting a voltage drop across a ~~component~~ <u>fuse</u> to a current, said computing device operatively associated with said probe, ~~said computing device having a pre-determined voltage drop/current relationship~~ ~~for said component stored in said computing device~~

          <u>an input device for selecting among multiple fuses, said input device operatively associated with said computing device, each fuse having a pre-determined voltage drop/current relationship stored in said computing device</u>, and

**Exhibit B**, pg. 125 of 199.

    41.    As will be explained in greater detail below, the shortcomings of the '654 Provisional Application—*i.e.*, the essential elements of the claims of the Accused Patent that are absent from the '654 Provisional Application—are most relevant to the instant Complaint, including to proving that Power Probe cannot possibly infringe any valid claim of the Accused Patent, and also demonstrating the objective baselessness and bad faith in Defendant's licensing demands.

### *The Enablement Requirement (35 U.S.C. §112(a))*

    42.    The enablement requirement refers to the requirement of 35 U.S.C. 112(a) that the specification describe how to make and how to use the invention. The invention that one skilled in the art must be enabled to make and use is that defined by the claim(s) of the particular application or patent.

11

43. "The purpose of the requirement that the specification describe the invention in such terms that one skilled in the art can make and use the claimed invention is to ensure that the invention is communicated to the interested public in a meaningful way. The information contained in the disclosure of an application must be sufficient to inform those skilled in the relevant art how to both make and use the claimed invention." MPEP 2164 (*The Enablement Requirement*).

44. A patent claim is invalid if it is not supported by an enabling disclosure.

45. Any analysis of whether a particular claim is supported by the disclosure in an application requires a determination of whether that disclosure, when filed, contained sufficient information regarding the subject matter of the claims as to enable one skilled in the pertinent art to make and use the claimed invention. *See* MPEP 2164.01 (Test of Enablement); *see also United States v. Telectronics, Inc.*, 857 F.2d 778, 785, 8 USPQ2d 1217, 1223 (Fed. Cir. 1988) ("The test of enablement is whether one reasonably skilled in the art could make or use the invention from the disclosures in the patent coupled with information known in the art without undue experimentation.").

46. For its part, 35 U.S.C. §112(a) states as follows:

(a)In General.—

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention.

47. Additionally, "to be entitled to the benefit of the filing date of an earlier-filed application, the later-filed application must be an application for a patent for an invention which is also disclosed in the prior application (the parent or earlier-filed nonprovisional application or

12

provisional application for which benefit is claimed); the disclosure of the invention in the prior application and in the later-filed application must be sufficient to comply with the requirements of 35 U.S.C. 112(a) except for the best mode requirement." MPEP 211.05; *See also Transco Prods., Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 32 USPQ2d 1077 (Fed. Cir. 1994).

48. "Accordingly, the disclosure of the prior-filed application must provide adequate support and enablement for the claimed subject matter of the later-filed application in compliance with the requirements of 35 U.S.C. 112(a) except for the best mode requirement." MPEP 211.05.

49. MPEP 211.05 goes on to explain that:

Under 35 U.S.C. 119(e), the written description and drawing(s) (if any) of the provisional application must adequately support and enable the subject matter claimed in the nonprovisional application that claims the benefit of the provisional application. In *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1294, 63 USPQ2d 1843, 1846 (Fed. Cir. 2002), the court held that for a **nonprovisional** application to be afforded the benefit date of the **provisional** application, "the specification of the **provisional** must 'contain a written description of the invention and the manner and process of making and using it, in such full, clear, concise, and exact terms,' 35 U.S.C. 112¶1, to enable an ordinarily skilled artisan to practice the invention claimed in the **nonprovisional** application."

In *New Railhead*, the patented drill bit was the subject of a commercial offer for sale. A provisional application was filed after the sale offer, but well within the one year grace period of 35 U.S.C. 102(b). A nonprovisional application, which issued as Patent No. 5,899,283, was filed within one year of the filing of the provisional application but more than one year after the sale offer. If the '283 patent was not afforded the benefit date of the provisional application, the patent would be invalid under 35 U.S.C. 102(b) since it was filed more than one year after the commercial offer for sale. The court looked at claim 1 of the '283 patent which recites a bit body being angled with respect to the sonde housing. The court then reviewed the provisional application and concluded that nowhere in the provisional application is the bit body expressly described as "being angled with respect to the sonde housing" as recited in claim 1 of the '283 patent. The court held that the disclosure of the provisional application does not adequately support the invention claimed in the '283 patent as to the angle limitation and therefore, the '283 patent is not entitled to the filing date of the provisional application under 35 U.S.C. 119(e)(1) and the '283 patent is invalid under 35 U.S.C. 102(b).

A claim is not required in a provisional application. However, for a claim in a later filed nonprovisional application to be entitled to the benefit of the filing date of the

13

provisional application, the written description and drawing(s) (if any) of the provisional application must adequately support and enable the subject matter of the claim in the later filed nonprovisional application. If a claim in the nonprovisional application is not adequately supported by the written description and drawing(s) (if any) of the provisional application (as in New Railhead), that claim in the nonprovisional application is not entitled to the benefit of the filing date of the provisional application.

50. Here, as will be explained in greater detail below, the '654 Provisional Application does not enable one of skill in the art to "make and use" the alleged invention of the '634 Patent, specifically because it does not teach the concept of *storing* a "pre-determined voltage drop/current relationship," which is admittedly essential to the operation of the invention, and which a person of ordinary skill would not have understood to be part of the invention and so would not have been able to "make or use" the invention as claimed.

51. In other words, as a result of the test for enablement, the '634 Patent is not entitled to the earlier (May 20, 2013) filing date of the '654 Provisional Application (which did not contain a reference to the "pre-determined voltage drop/current relationship"), and is instead entitled to priority only as of May 7, 2014, the date on which the '542 Non-Provisional Application was filed, which did, for the first time, contain said reference.

52. This understanding of the '634 Patent's actual priority date feeds into the analysis below, since, without the benefit of the May 2013 priority date, the '634 Patent is even more vulnerable to validity challenges based on later prior art, including but not limited to the MATCO TH209 Device, which launched no later than late 2012. As will be explained in greater detail below, this means that it was "on sale" more than one year before the '634 Patent's true priority date of May 7, 2014.

14

### The On-Sale Bar (35 U.S.C. §102(a)-(b))

53.     Pursuant to 35 U.S.C. §102(a)(1), a person shall be entitled to a patent unless: "the claimed invention was patented, described in a printed publication, or in public use, **on sale**, or otherwise available to the public before the effective filing date of the claimed invention." The emphasized portion above has become known as the "on sale bar".

54.     Additionally, pursuant to 35 U.S.C. §102(b)—"*Exceptions*":

(1) Disclosures made 1 year or less before the effective filing date of the claimed invention.—A disclosure made 1 year or less before the effective filing date of a claimed invention shall not be prior art to the claimed invention under subsection (a)(1) if—

    (A) the disclosure was made by the inventor or joint inventor or by another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor; or

    (B) the subject matter disclosed had, before such disclosure, been publicly disclosed by the inventor or a joint inventor or another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor.

55.     In other words, assuming that none of the exceptions of Section 102(b) apply (*e.g.*, that there is no relevant nexus between the '634 Patent's inventor (Kevin M. Curtis) and "the disclosure" (*e.g.*, the product that was "on sale"), then the '634 Patent is invalid if the claimed invention was "on sale" prior to May 7, 2014 (if the '634 Patent is not entitled to the provisional filing date), or else May 20, 2013 (if the '634 Patent is somehow entitled to the provisional filing date).

### The MATCO TH209 Device

56.     There are two important aspects of the MATCO TH209 Device. ***First***, that it was "on sale" in "late 2012," before "the effective filing date of the claimed invention," regardless of whether the correct "effective filing date" is May 20, 2013 (provisional) or May 7, 2014 (non-

15

provisional). **_Second_**, is that the MATCO TH209 Device practices the claimed invention of the '634 Patent. Combined these two facts result in the '634 Patent being invalid under 35 U.S.C. §102, since the MATCO TH209 constitutes prior art.

57. As to the first aspect, timing: in late 2012, MATCO Tools launched the TH209 "Fusehound" Device. _See_ **Exhibit D**. According to the MATCO's own brochure, the TH209 comprised the following features and capabilities:

a. "Obtain circuit amperage without needing to remove the fuse"

b. "Test[] amperage on standard Mini and Maxi fuses"

c. "Adjustable fuse values allows accurate testing on most fuses

d. "Great for finding parasitic drains or determining if fuse is receiving correct amperage"

58. The image of the TH209 as it appeared in the MATCO Brochure is reproduced below:



**Exhibit D**

16

59. The captain at the top of page 1 of the brochure confirms the date range for this "new" product as no later than January 13, 2013:



60. That the MATCO TH209 was "on sale" in 2012 is confirmed by the May 2013 edition of *Professional Tool & Equipment News*, at pg. 19, showing that the MATCO TH209 had already been on the market long enough to have been nominated for an "Innovation Award":



**Exhibit E**.

61.     As yet further evidence that the MATCO TH209 was on sale in 2012, below is an excerpt from a Vehicle Service Pros online publication dated March 25, 2013, discussing the MATCO TH209:

PRODUCT GUIDE  >  TOOLS

# TH209 Professional Circuit and Parasitic Drain Tester

March 25, 2013

**Related To:**
Matco Tools

---

The **Matco Tools TH209 Professional Circuit/Parasitic Drain Tester** tests circuits up to 80 amps using the fuse contacts instead of connecting the amp meter to the circuit. Unit tests mini, maxi and ATO fuses and can be used on all domestic and foreign makes and models. The Fuse Value button allows the user to select a specific fuse ranging from 5A to 80A to get precise readings. The tester verifies if a fuse is blown, if there is a parasitic drain, or if there is no connection. This tool is not polarity-sensitive when contacting test leads to fuse contacts. Made in the USA.

**Exhibit F**; also available at
https://www.vehicleservicepros.com/directory/tools/product/10909501/matco-tools-th209-professional-circuit-and-parasitic-drain-tester.

62.     As yet further evidence, a June 14, 2013 article discussing the aforementioned "Innovation Award" refers to the TH209 as being "launched in late 2012".

18

JUNE 14, 2013

# Matco Tools wins Innovation Award from PTEN

**AUTO REPAIR & SERVICE** · CARS Magazine · Share

The automotive tool company has received a 2013 Innovation Award from Professional Tool & Equipment News (PTEN) in the electrical systems category for the TH209 Professional Circuit/Parasitic Drain Tester.

Recipients of the Innovation Award are chosen by PTEN's panel of active and independent techs, shop owners, and tool distributors, making the results a reflection of industry trends, product utility and end-user popularity. The winning products will be featured in the June issue of PTEN's monthly magazine.

"The tester was designed to ensure that technicians are able to work as quickly and efficiently as possible, and we are pleased with the recognition that it has received," said Aaron Allison, product manager at Matco Tools. "TH209's ability to check fuses without removal helps shops save time, while still providing great service, ultimately helping increase profitability and making it a great tool for any shop."

The TH209 Professional Circuit/Parasitic Drain Tester is a Matco-exclusive product that was launched in late 2012. It is unlike any other circuit tester on the market, as it is the only tool that allows a technician to quickly test fuses without removing them. The tester also has features that allow technicians to adjust fuse values, allowing accurate testing on most fuses, test amperage on standard Mini and Maxi fuses and use on all domestic and foreign vehicle makes and models.

www.matcotools.com




**Exhibit G**.

63.     Accordingly, there can be no dispute that the MATCO TH209 was "on sale" before May 20, 2013, and consequently before May 7, 2014, and likely also at least one year before May 20, 2013, to the extent that one of the exceptions in 35 U.S.C. §102(b) is applicable.

64.     As to the second aspect, the MATCO TH209 Device practices the patented invention of the '634 Patent.

65.     By way of example, the MATCO TH209 comprises a "Fuse Value [B]utton [which] allows the user to select a specific fuse ranging from 5A to 80A to get precise readings." **Exhibit E**, pg. 19. This lines up with the claim element disclosing "an input device for selecting among multiple fuses types."

66.     As another example, the MATCO TH209 "verifies if a fuse is blown, if there is a parasitic drain, or if there is no connection." **Exhibit E**, pg. 19. This lines up with the claim element

19

disclosing "a computing device for converting a Voltage drop across a fuse to a current, the Voltage drop is associated with the parasitic current leak."

67.     As another example, the MATCO TH209 comprises each of a "probe", "computing device," "input device," and "output device" as disclosed in the '634 Patent:



68.     Accordingly, since the MATCO TH209 meets and every one of the claim elements of the '634 Patent, and since it was "on sale" before the effective filing date of the '634 Patent, the MATCO TH209 is invalidating prior art under 35 U.S.C. §102.

### *The Accused Power Probe Products*

69.     As its most recent licensing/monetization target, Defendant has set its sights on two of Power Probe's newer products, the DM300AUTO Digital Multimeter (the "Power Probe DM300") and the Fuse Monitor (the "Power Probe Fuse Monitor") (collectively the "Accused Power Probe Products").

70.     An image of the Power Probe DM300 is reproduced below:



**Exhibit H**.

71. Defendant's interest in licensing the Power Probe DM300 apparently stems from its "Parasitic Draw Diagnostic Mode" which allows for "[f]use voltage drop testing" (see below):



**Exhibit H**.

72. An image of the Power Probe Fuse Monitor is reproduced below:



**Exhibit I**.

73. Defendant's interest in licensing the Power Probe Fuse Monitor apparently stems from its ability to "quickly locate parasitic draw in vehicles without fuse removal" (see below):



**Exhibit I**.

74.     Power Probe is dedicated to the creation of innovative, easy-to-use, diagnostic equipment for the automotive industry. As automotive technology continues to evolve, Power Probe aims to provide innovative technology, engineering, and knowledge solutions for technicians and consumers alike. *See* **Exhibit J**. Power Probe is proudly headquartered in Charlotte, NC.

75.     Power Probe has spent significant resources developing, designing, testing, manufacturing, marketing, and selling the DM300 and Fuse Monitor and intends to feature this product moving forward and rely on it to continue to build on Power Probe's reputation in the industry as both an innovator and provider of high-quality, reliable automotive diagnostic tools.

76.     Defendant's unlawful threats of patent infringement and its demand that Power Probe take a license or cease selling the DM300 and Fuse Monitor poses a grave and imminent threat to Power Probe.

### *The MATCO TH209 Renders the Accused Patent Invalid Under 35 U.S.C. § 102*

77.     The Accused Patent is invalid as anticipated under 35 U.S.C. § 102 since, as demonstrated above, the MATCO TH209 constitutes prior art and practices each and every asserted claim of the '634 Patent.

78.     Specifically, regardless of whether the '634 Patent is entitled to the earlier (May 20, 2013) effective priority date of the '654 Provisional Application or, more likely—since the provisional application does not enable at least the "stor[ing] a pre-determined voltage drop/current relationship" (*see* 35 U.S.C. §112(a))—the later (May 7, 2014) effective priority date of the '542 Non-Provisional Application, the MATCO TH209 was "on sale" in 2012, and none of the exceptions in §102(b) apply. *See* 35 U.S.C. 102.

79.     Indeed, on information and belief, Defendant has licensed (or attempted to license) products similar to the TH209, essentially admitting that those products practice the '634 Patent.

*Defendant's Demand Letter and Conduct During Licensing Negotiations*

80.    Defendant first contacted Power Probe via letter dated March 6, 2025, attached hereto as **Exhibit K** (hereinafter the "March 6, 2025 Demand Letter"). The March 6, 2025 Demand Letter included threatening language including, *e.g.*, that the Power Probe DM300 "appears to be in violation" of the '634 Patent, and that Defendant "believe[s] that this item is infringing every element of the independent apparatus and method claims of [the '634] Patent."

81.    The March 6, 2025 Demand Letter ends with a thinly-veiled threat that Power Probe has two choices: (1) pay Defendant a license for a clearly invalid patent or (2) get sued: "In order to avoid seeking legal remedies, I simply ask that you contact me immediately so that we may discuss licensing options."

82.    Notably, as it relates to the APAA, the March 6, 2025 Demand Letter provided an unreasonable timeframe for Power Probe to respond: "**immediately**."

83.    Additionally, the March 6, 2025 Demand Letter **does not include a claim chart**.

84.    Defendant followed up with a second demand letter on March 25, 2025 (the "March 2025 Demand Letter"), a copy of which is attached hereto as **Exhibit L**.

85.    In it, Defendant continued to use threatening language towards Power Probe: "I believe this function [of the Power Probe DM300] infringes the patent I mentioned above" and "I believe that [the Power Probe Fuse Hound] also infringes my patent."

86.    Defendant also admitted in its March 25, 2025 Demand Letter that its reason for existence and main (if not only) source of income is to license its patents, including the '634 Patent.

87.    Defendant has also called counsel for Power Probe several times and repeated its demand that Power Probe must take a license or else be sued. During one such hostile phone conversation, Mr. Curtis told counsel for Power Probe: "I guess you want to be sued then."

24

88.     Mr. Curtis also demanded that Power Probe take the Accused Power Probe Products off of the market, essentially seeking a permanent injunction that even this Court likely would not grant to a non-practicing patent troll who cannot show requisite irreparable harm. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).

89.     Defendant continued to ratchet up the pressure on Power Probe and, on May 13, 2025, counsel for Power Probe received an email from Stephen S. Ashley, Jr., counsel for Defendant, expecting to continue the licensing conversation. **Exhibit M**, pg. 2. Mr. Ashley, Jr. followed up with a second email on May 28, 2025, emphasizing that "[his] client wants infringement of the patent to stop" and that Defendant "is willing to consider granting a license of the ['634] Patent to Power Probe." **Id.**, pg. 1. In his letter, Mr. Ashley demanded a permanent injunction that even this Court likely would not grant to a non-practicing patent troll, such as Mr. Ashley's client, who cannot show requisite irreparable harm. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).

90.     On information and belief, as is common practice for patent trolls, Defendant has offered to license (and licensed) its patents (including the '634 Patent) to a myriad of entities including, *e.g.*, Electronic Specialties, Wilmar (Performance Tool), Lisle Tools, and Snap-On. *See, e.g.*, **Exhibit L**.

### *Defendant is a Self-Proclaimed Patent Troll*

91.     Rather than hide its patent-trolling activities, Defendant is proud that, rather than practice its own patents, its main source of income is extorting patent licenses and threatening patent litigation. *See, e.g.*, **Exhibit L** (admitting that it no longer sells the Amp Hound[TM] and that, instead, it "currently license[s] a few of its patents").

25

92.     Indeed, Defendant's managing member and the named inventor of the '634 Patent—Kevin Curtis—was featured in a January 16, 2025 article titled *Licensing Process: How Kevin Curtis Turned His Electronics Passion into Royalties*. A copy of the article is attached hereto as **Exhibit N**.

93.     In that article, Mr. Curtis unabashedly shares how he "has built a career by licensing his innovative tools to companies Categories and living off the royalties." **Id**., pg. 1.

94.     Mr. Curtis also admits that he never intends to make, use, sell or offer to sell an actual product that practices any of his patents, but rather that he merely aims to "build a prototype," and then use it to extort practicing entities for licensing revenue. **Id**., pg. 2.

95.     In a video interview related to the above article, at around the 2:40 minute mark, Mr. Curtis says: "I live on royalty checks." *See* https://www.youtube.com/watch?v=onrggJxd2S4.

96.     At around the 14 minute mark, Mr. Curtis also states that "most of [his] agreements are not in writing." The lack of written agreements is violative of N.C. Gen. Stat. § 25-2-201 if not 35 U.S.C. § 261 and/or N.C. Gen. Stat. 75-4. *See Nexus Techs., Inc. v. Unlimited Power, Ltd*., No. 1:19-CV-00009-MR, 2020 WL 6940505, at *6 (W.D.N.C. Nov. 25, 2020) (citing *Avanti Hearth Prod., LLC v. Janifast, Inc*., No. 3:10-cv-00019-FDW-DCK, 2011 WL 5600634, at *5 (W.D.N.C. Nov. 16, 2011) (Mullen, J.)).

97.     In sum, Defendant is clearly a patent troll, and a proud one at that.

***Defendant's Conduct Violates the North Carolina Abusive Patent Assertion Act (the APAA)***

98.     The APAA guidelines explicitly provide that "[a] court may consider [several] factors as evidence that a person has made a bad-faith assertion of patent infringement. *See* APAA, § 75-143(a). Several of the enumerated factors support a finding that Defendant has made a bad-faith patent assertion in this case.

26

99.     First, under § 75-143(a)(2), bad faith patent infringement can be found if "[p]rior to sending the demand, the person failed to conduct an analysis comparing the claims in the patent to the target's products, services, and technology, or the analysis was done but does not identify specific areas in which the products, services, and technology are covered by the claims in the patent."

100.     Here, although Defendant's Demand Letters claims to have performed an analysis, Defendant's analysis was woefully inadequate in that it failed to identify the infringing features of the Accused Power Probe Products with reasonable specificity.

101.     For example, neither of Defendant's Demand Letters include a claim chart, as is customary.

102.     As yet another example, Defendant fails to explain how either of the Accused Power Probe Products satisfy any claim of the '634 Patent, including if or how either device stores a pre-determined voltage drop/current relationship.

103.     Second, under § 75-143(a)(4), bad faith patent infringement can be found if "[t]he person demands payment of a license fee or response within an unreasonably short period of time."

104.     Here, as explained above, Defendant's March 6, 2025 Demand Letter requested that Power Probe take action "immediately." **Exhibit K**. There is no clearer violation of this factor, or a shorter "period of time", than exhibited by Defendant in this case.

105.     Third, under § 75-143(a)(5), bad faith patent infringement can be found if "[t]he person offers to license the patent for an amount that is not based on a reasonable estimate of the value of the license, or the person offers to license the patent for an amount that is based on the cost of defending a potential or actual lawsuit."

27

106. On information and belief, the monetary demand contemplated by Defendant is not tied to the value of the alleged invention in the '634 Patent, but rather tied directly to the anticipated cost of defending an action. Defendant made this point clear in its March 6, 2025 Demand Letter. *See* **Exhibit K** (tying the licensing component to the phrase "in order to avoid seeking legal remedies.") Defendant has never represented that its licensing offer to Power Probe would be specifically tailored or based in any way on Defendant's perceived "value" of the license to Power Probe.

107. Accordingly, the factor enumerated in § 75-143(a)(5) supports a finding of bad-faith assertion of patent infringement by Defendant.

108. Fourth, under § 75-143(a)(6), bad faith patent infringement can be found if "[t]he claim or assertion of patent infringement is meritless, and the person knew or should have known that the claim or assertion is meritless…."

109. Here, as explained above, the '634 Patent is so clearly invalid that Defendant knew or should have known that its claim of patent infringement is meritless.

110. Accordingly, the factor enumerated in § 75-143(a)(6) supports a finding of bad-faith assertion of patent infringement by Defendant.

111. Fifth, under § 75-143(a)(7), bad faith patent infringement can be found if "[t]he claim or assertion of patent infringement is deceptive.

112. Here, for the reasons stated above, Defendant should have known that its infringement theory was meritless, yet prepared and sent its Demand Letters in which Defendant attempted to pass off the '634 Patent as an invention worth licensing.

113. Accordingly, the factor enumerated in § 75-143(a)(7) supports a finding of bad-faith assertion of patent infringement by Defendant.

114.    Sixth, under § 75-143(a)(11), bad faith patent infringement can be found if "The person making the claim or assertion seeks an injunction when that is objectively unreasonable under the law."

115.    Here, counsel for Defendant stated in an email to counsel for Power Probe: "My client wants infringement of the patent to stop." **Exhibit M**.

116.    As a non-practicing entity, there is simply no universe in which Defendant would be able to demonstrate the "irreparable harm" which is a pre-requisite for the issuance of injunctive relief. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006); *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008).

117.    Additional discovery may also reveal that additional factors support a finding of Defendant's bad faith assertion of patent infringement including but not limited to factors (8), (9), and (10).

## COUNT I – DECLARATION OF NON-INFRINGEMENT OF U.S PATENT NO. 9,494,634
*(28 U.S.C. § 2201)*

118.    Power Probe restates and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

119.    Power Probe has not infringed and does not infringe any valid and enforceable claim of the '634 Patent, whether literally or under the doctrine of equivalents.

120.    Additionally, Power Probe is not liable for any induced, contributory, divided, or any other indirect infringement of any valid and enforceable claim of the '634 Patent.

121.    Specifically, as explained in greater detail above, the '634 Patent is invalid, and one cannot infringe an invalid patent.

29

122.     In light of the Defendant's Demand Letters, the Parties' licensing communications, and the threat of litigation, there exists a substantial, real and immediate controversy between Power Probe and Defendant concerning Power Probe's alleged infringement of the '634 Patent.

123.     Defendant's conduct towards Power Probe, combined with Defendant's admitted activities as a patent troll, clearly demonstrates Defendant's intent to continue to threaten Power Probe with potential or actual litigation.

124.     This controversy warrants the issuance of a declaratory judgment of non-infringement.  A judicial declaration is necessary and appropriate so that Power Probe may ascertain its rights and obligations vis-à-vis the '634 Patent.

125.     Power Probe therefore respectfully seeks a judicial declaration that it does not directly, indirectly or otherwise infringe any valid and enforceable claim of the '634 Patent.

### COUNT II – DECLARATION OF INVALIDITY OF U.S PATENT NO. 9,494,634
*(28 U.S.C. § 2201; 35 U.S.C. §§ 102, 103, 112, 119)*

126.     Power Probe restates and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

127.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., Power Probe requests a declaration by the Court that the '634 Patent is invalid for failure to satisfy one or more of the conditions for patentability set forth in 35 U.S.C. § 101 *et seq*., including particularly, 35 U.S.C. §§ 102, 103, 112 and/or 119.

128.     The claims of the '634 patent are invalid because they are anticipated pursuant to 35 U.S.C. § 102 or rendered obvious pursuant to 35 U.S.C. § 103 by prior art patents, printed publications, and/or public use or on-sale activities, including, but not limited to the MATCO TH209 Tool, alone or in combination, when considered in view of the knowledge of a person of

ordinary skill in the art. Prior art to be relied on at trial will be identified as required by 35 U.S.C. § 282 and/or any order entered by the Court.

129. The claims of the '634 Patent are invalid pursuant to 35 U.S.C. § 112 and/or 35 U.S.C. § 119 for failure to comply with the enablement requirement. As discussed in greater detail above, the '654 Provisional Application does not enable one of skill in the art to "make and use" the alleged invention of the '634 Patent, specifically because it does not teach the concept of storing a "pre-determined voltage drop/current relationship," which is essential to the operation of the invention, and which a person of ordinary skill would not have understood to be part of the invention and so would not have been able to "make or use" the invention as claimed.

130. The aforementioned controversy warrants the issuance of a declaratory judgment of invalidity. A judicial declaration is necessary and appropriate so that Power Probe may ascertain its rights and obligations vis-à-vis the '634 Patent.

131. Power Probe therefore respectfully seeks a judicial declaration that the '634 Patent is invalid under one or more of 35 U.S.C. §§ 102, 103, 112 and/or 119.

## COUNT III – VIOLATION OF THE
## NORTH CAROLINA ABUSIVE PATENT ASSERTION ACT
### *(N.C. Gen. Stat. §§ 75-140, et seq.)*

132. Power Probe restates and incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

133. Defendant's assertion of patent infringement against Power Probe—as demonstrated in the Demand Letters and during the Parties' telephonic conferences and email correspondence—is both objectively baseless and made in bad faith.

134. For example, as evidenced by the Demand Letter itself, Defendant failed to conduct a reasonable comparison of the claims of the '634 Patent to the Accused Power Probe Products. Any reasonable investigation would have revealed that the Accused Power Probe Products do not

31

infringe any valid and enforceable claim of the '634 Patent. Yet Defendant has continued to assert its meritless claims of infringement.

135.    Defendant's conduct to date, including as evidenced by the Demand Letters and accompanying licensing demand, as well as Defendant's demonstrated and admitted conduct of broadly asserting the '634 Patent against other entities, demonstrates that Defendant's licensing demand is not based on a reasonable estimate of the value of the '634 Patent to Power Probe, but instead on the cost of defending a potential or actual lawsuit. *See* §75-143(a)(5).

136.    As a result of Defendant's objectively baseless and subjectively bad faith and abusive assertions that the Accused Power Probe Products infringe the '634 Patent, Power Probe has suffered and continues to suffer damages and incur costs, fees (including attorneys' fees), and other harm, all of which are recoverable under the North Carolina Abusive Patent Assertion Act. *See id*. §§ 75-145(b)(1)-(3).

137.    Power Probe seeks both equitable relief enjoining Defendant from continuing to assert the '634 Patent against the Accused Power Probe Products as well as recovery of its damages, costs, and fees, together with an award of exemplary damages in an amount equal to $50,000 or three (3) times the total of damages, costs, and fees, whichever is greater. *See id*. §§ 75-145(b)(1)-(4).

## COUNT III – VIOLATION OF THE
## NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### *(N.C. Gen. Stat. §§ 75-1.1, et seq.)*

138.    Power Probe restates and incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

139.     In written and oral communications with Power Probe and Power Probe's outside counsel, Defendant has repeatedly demanded that Power Probe immediately cease selling the Accused Power Probe Products.

140.     Defendant is a patent troll for all of the reasons set forth in the above allegations. Defendant does not manufacture and sell any products practicing the claims of the '634 Patent.

141.     Even if the '634 Patent were valid, enforceable, and infringed (and it is none of those), it is black letter law that Defendant is not entitled to an injunction because Defendant, as a patent troll, cannot show irreparable harm which is required by the Supreme Court in *eBay* and *Winter*. 547 U.S. 388; 555 U.S. 7 (2008).

142.     Likewise, Defendant's efforts to extort a royalty from Power Probe are indicative of a larger course of conduct of violating North Carolina laws in pursuit of Defendant's unfair trade practices. Defendant does not own a valid and enforceable patent, a fact known to Defendant. As Defendant readily admits and boasts, Defendant has a pattern of not placing its royalty terms in writing, preferring to extort royalties from its targets under the table. N.C. Gen. Stat. §75-4 requires that such agreements which limit rights to do business must be in writing.

143.     Defendant's unfair and deceptive trade practices have directly impacted Power Probe by diverting time and resources from Power Probe's business activities in this state. Resources which would have been spent paying the salaries for research and development at Power Probe's headquarters in Charlotte, North Carolina, have been unfairly diverted to defend against the baseless threats of patent infringement and baseless demands to cease selling Power Probe's products to the purchasing public.

144.     These actions by Defendant constitute unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1 *et seq*. from which Power Probe has been damaged.

33

Accordingly, Power Probe seeks recovery of its treble damages pursuant to N.C. Gen. Stat. §75-16.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Power Probe Group, Inc. respectfully requests the following relief:

A.      A declaration that Power Probe has not infringed and does not infringe, directly or indirectly, any valid and enforceable claim of U.S. Patent No. 9,494,634, whether literally or under the doctrine of equivalents;

B.      An order declaring that this is an exceptional case and awarding Power Probe its costs, expenses, disbursements, and reasonable attorneys' fees under 35 U.S.C. § 285 and 28 U.S.C. § 1927;

C.      An order finding Defendant's conduct to be in violation of the North Carolina Abusive Patent Assertion Act (N.C. Gen. Stat. § 75-140 *et seq*.) (the "APAA)" and awarding to Power Probe all remedies contemplated by the APAA, including but not limited to all damages, costs, expenses, and fees (including attorneys' fees) incurred by Power Probe as a result of Defendant's bad faith assertion of patent infringement, together with all pre- and post-judgment interest as provided by law, as well as equitable relief to estop Defendant from continuing to assert the '634 Patent against Power Probe;

D.      An entry ordering Defendant to post a bond of up to $500,000 pursuant to N.C. Gen Stat. § 75-144.

E.      An Order finding Defendant's conduct to be in violation of the North Carolina Unfair And Deceptive Trade Practices Act (N.C. Gen. Stat. §75-1.1 *et seq*.) ("UDTPA") and awarding Power Probe its damages thereunder which are automatically trebled pursuant to N.C.

Gen. Stat. §75-16, and also an award of Power Probe's reasonable attorneys' fees pursuant to N.C. Gen. Stat. §75-16.1.

F.     All such other and further relief, both at law and in equity, which the Court deems just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff, Power Probe Group, Inc. hereby demands a trial by jury of all issues so triable.

This the 12th day of June, 2025.

Respectfully submitted,

*/s/ Samuel Alexander Long, Jr.*
Samuel Alexander Long, Jr. (N.C. Bar No. 46588)
Tom BenGera (N.C. Bar No. 57019)
Lucas D. Garber (N.C. Bar No. 47756)
SHUMAKER, LOOP & KENDRICK, LLP
101 South Tryon St., Suite 2200
Charlotte, North Carolina 28280-0002
Telephone: 704-945-2911
Fax: 704-332-1197
Email:  along@shumaker.com
         tbengera@shumaker.com
         lgarber@shumaker.com

*Attorneys for Plaintiff Power Probe Group, Inc.*